### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

DELTA MB, LLC

      v.                                  Case No. 24-cv-00143-TSM
                                                Opinion No. 2025 DNH 082

271 SOUTH BROADWAY, LLC

### ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This action arises out of a long-term lease for commercial property in Salem, New Hampshire. See Doc. No. 1-1. Plaintiff Delta MB, LLC ("Delta MB") claims that defendant, 271 South Broadway, LLC ("South Broadway"), a tenant at the property, breached the lease by failing to pay over $740,000.00 that it owed to plaintiff for monthly rental fees, common area expenses, and real estate taxes. Id. at Count I; Doc. No. 29-1 at pg. 5. Alternatively, Delta MB asserts that South Broadway is liable for the fees, taxes, and expenses it failed to pay based on the doctrine of unjust enrichment/quantum meruit. Doc. No. 1-1 at Count II; Doc. No. 29-1 at pgs. 7-8. South Broadway denies Delta MB's claims. See Doc. No. 19. It argues that there was no breach because the parties agreed to terminate the lease by mutual consent. Doc. No. 32 at pgs. 1-2. It also argues that Delta MB received accord and satisfaction for its claims by accepting South Broadway's assignment of its rights to payments from one of its subtenants and by endorsing and cashing the checks from the subtenant "in full and final settlement of all amounts allegedly owed by 271 South Broadway to Delta MB." Id. The matter is before the court on the parties' cross-motions for summary judgment (Doc. Nos. 29 and 32). For the reasons detailed below, Delta MB's motion for summary judgment (Doc. No. 29) is granted and South Broadway's cross-motion for summary judgment (Doc. No. 32) is denied.

## BACKGROUND

The following facts, which are relevant to the parties' motions for summary judgment, are undisputed unless otherwise indicated.[1]

### *The Lease Agreement*

Delta MB owns real estate at 265 Broadway in Salem, New Hampshire (the "Property"). Doc. No. 33-1 at ¶ 2. On April 18, 1995, Delta MB's predecessor in interest, T.A. Demoulas, Trustee of Delta & Delta Realty Trust ("Demoulas"), entered into a 20-year lease agreement (the "Lease") with Service Merchandise Company, Inc. ("Service Merchandise") under which Demoulas agreed to lease, and Service Merchandise agreed to rent, approximately 50,110 square feet of retail and other space at the Property. Doc. No. 29-2 at ¶¶ 4-6; Doc. No. 29-3 at pg. 1.[2] The tenant had the option to extend the lease, with an adjustment in annual rent, for four additional five-year periods. Doc. No. 29-2 at ¶ 7; Doc. No. 29-3 at pg. 2. The tenants exercised that option

---

[1] The facts are derived from the following evidence filed by the parties in connection with their cross-motions for summary judgment: (1) the Declaration of Charbel Dahbour in Support of Plaintiff's Motion for Summary Judgment (Doc. No. 29-2) and Attachments 1 through 5 thereto (Doc. Nos. 29-3 through 29-7); (2) the Affidavit of Jack B. Corwin in Support of Objection to Plaintiff's Motion for Summary Judgment (Doc. No. 33-1) and Exhibits A through N thereto (Doc. Nos. 33-2 through 33-18); and (3) the Declaration of John Matthews in Support of Plaintiff's Objection to Defendant's Cross-Motion for Summary Judgment (Doc. No. 36-1) and the exhibits attached thereto (Doc. Nos. 36-2 through 36-5). However, the court has not credited affidavit testimony that consists of legal arguments or conclusory assertions. See Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 33, 56 (1st Cir. 2011) (on summary judgment, courts "afford no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" (quoting Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001)); Estes v. ECMC Grp., Inc., 565 F. Supp. 3d 244, 254-57 (D.N.H. 2021) (declining to credit conclusory statement contained in affidavit); Power v. Connectweb Techs., Inc., 740 F. Supp. 3d 63, 71 (D. Mass. 2024) (explaining that court need not consider affidavit testimony consisting of conclusory assertions in connection with summary judgment).

[2] Unless otherwise indicated, the page numbers cited herein correspond to the page numbers of the exhibit rather than the page numbers designated by the court's CM/ECF system.

over the years, and the current term of the Lease is set to expire on February 28, 2026.  Doc. No. 33-1 at ¶ 13.

On May 15, 2013, Service Merchandise's successor, CFSMC-Salem, LLC, assigned and conveyed its rights as tenant under the Lease to defendant South Broadway, a single purpose entity that was in the business of leasing commercial space from landlords and sub-leasing it to retail merchants.  Doc. No. 29-2 at ¶ 8; Doc. No. 33-1 at ¶ 3.  South Broadway deemed the Property desirable because it contained a shopping plaza that appealed to high volume retail tenants and enabled customers to visit multiple stores in a single location.  Doc. No. 33-1 at ¶ 4.  Moreover, the Property's location, just over the state line from Massachusetts, was attractive to customers from both New Hampshire and Massachusetts.  Id.  Under the terms of the Lease, South Broadway was responsible for paying monthly rent, a portion of the common area maintenance ("CAM") expenses, and the real estate taxes associated with the leased portion of the Property.  Id. at ¶ 15; Doc. No. 29-2 at ¶ 11.

### *The COVID Rent Relief Agreement*

South Broadway subleased its interest in the Property to two separate retail businesses – A.C. Moore and Bed Bath & Beyond ("BBB") – each of which used a portion of the leased premises.  Doc. No. 29-2 at ¶ 12; Doc. No. 33-1 at ¶ 16.  In 2019, A.C. Moore's business began to struggle, and in 2020, it closed the Salem, New Hampshire store, leaving its portion of the Property vacant.  Doc. No. 33-1 at ¶ 18.  To make matters worse, by the spring of 2020, the COVID-19 pandemic threatened businesses across the country, thereby making it unclear how any of the tenants at the Property would continue to pay their rents.  See id. at ¶ 19.  Against this backdrop, in early May 2020, the parties engaged in a number of discussions about how to manage the A.C. Moore space and address other rent-related concerns.  Id. at ¶ 20.

Later that month, Delta MB provided South Broadway with a Rent Relief Offer (the "COVID Rent Relief Agreement") wherein plaintiff offered to defer South Broadway's "May and June 2020 rent and CAM payments (not including real estate tax payments)" for the Property, "with repayment of these amounts to be spread out in 12 equal monthly payments, with the first such payment due on December 1, 2020." Doc. No. 29-5. South Broadway accepted the offer to defer its rent by executing the COVID Rent Relief Agreement on May 11, 2020. Id. As set forth in the Agreement, South Broadway acknowledged, in relevant part, that its acceptance of plaintiff's offer was "expressly conditioned on [its] compliance with all requirements and conditions of this [Agreement] and [its] continued compliance with all requirements and obligations under [its] [L]ease, which shall remain in full force and effect except as expressly modified hereby." Id. (capitalization omitted). At the time South Broadway executed the COVID Rent Relief Agreement, it paid plaintiff $31,318.75 in monthly rent under the Lease. Doc. No. 29-2 at ¶ 13. Therefore, the deferred rent totaled $62,637.50. See Doc. No. 33-9 at pg. 2.

### Defendant's Unilateral Reduction of Payments to Delta MB

After A.C. Moore vacated the Property, South Broadway hired a broker to identify potential sub-tenants to fill the empty retail space. See Doc. No. 33-1 at ¶ 22; Doc. No. 36-1 at ¶ 3. By July 2020, no sub-tenant had been found. See Doc. No. 33-1 at ¶¶ 23, 26. Nevertheless, on July 24, 2020, South Broadway informed Delta MB that it was invoking its option to extend the Lease for an additional 5-year term at a cost of $400,880.00 per year, or $33,406.67 per month. Doc. No. 29-2 at ¶ 14.

The A.C. Moore space remained vacant throughout the remainder of 2020. See Doc. No. 33-1 at ¶ 27; Doc. No. 36-1 at ¶¶ 5-6. South Broadway continued to pay Delta MB all amounts due under the Lease through November 2020. Doc. No. 33-1 at ¶ 26; Doc. No. 36 at pg. 5.

4

However, in December 2020, South Broadway paid Delta MB only $16,198.78 of the $31,318.75 monthly rental fee due to A.C. Moore's abandonment of its subleased portion of the Property.  See Doc. No. 29-2 at ¶ 16; Doc. No. 33-15 at pg. 4.  South Broadway also reduced its payment of CAM expenses and real estate taxes, and failed to pay the amounts it owed to Delta MB under the terms of the COVID Rent Relief Agreement.  Doc. No. 29-2 at ¶¶ 17, 19; Doc. No. 33-15 at pg. 4.  South Broadway continued to make payments to Delta MB for the BBB space, but not the former A.C. Moore space, through February 2023, after which it ceased all payments on the Property.  See Doc. No. 29-2 at ¶ 24; Doc. No. 29-7; Doc. No. 33-1 at ¶ 62; Doc. No. 33-15 at pg. 4.

### *Delta MB's Response to the Reduced Payments*

Jack B. Corwin, defendant's managing member at all times relevant to this case, asserts that Delta MB had no objection to defendant's reduction in payments because Delta MB determined that it would likely be more lucrative for it to take control of the A.C. Moore space than to enforce the terms of the Lease.  See Doc. No. 33-1 at ¶¶ 27-31.  Thus, according to Mr. Corwin, in December 2020, he explained to John Matthews, Delta MB's representative for the Property, that South Broadway had difficulty finding a tenant willing to rent the A.C. Moore space for only five years, and that prospective tenants wanted to negotiate directly with Delta MB.  Id. at ¶ 27.  Mr. Corwin claims that during the conversation,

> Mr. Matthews agreed that it would be beneficial to Delta MB if it took over that space and marketed it because (1) Delta MB had a preferred "type" of high-volume commercial tenant that would be compatible with the existing tenants; and (2) 271 South Broadway had been paying below-market rent and, even with a delay in finding a tenant immediately, Delta MB stood to profit by taking over the space.

Id.  Because it was unclear how long it would take for Delta MB to find a new tenant to occupy the A.C. Moore space, Mr. Corwin claims the parties agreed that "if Delta MB was unable to find a tenant in a reasonable amount of time, they would negotiate an equitable agreement."  Id. at ¶

28.  According to Mr. Corwin, "[a]t that point, 271 South Broadway would only be financially responsible going forward for the space occupied by [BBB], and would pay the rent and the proportionate share of BBB's CAM charges and real estate taxes."  Id. at ¶ 29.   Mr. Corwin contends that "Delta MB accepted 271 South Broadway's rent reduction in December 2020 and all months thereafter for the next two years without complaint or notice of default, and that Delta MB immediately began marketing the former A.C. Moore space."  Id. at ¶ 31.

Delta MB disputes Mr. Corwin's account of these discussions and contends that no such agreement took place.  See Doc. No. 36 at pgs. 5-7.  Although Mr. Matthews confirms that he engaged in communications with Mr. Corwin in and around December 2020, and that he offered to help South Broadway find a new subtenant for the former A.C. Moore space, he denies that Delta MB agreed to take responsibility for marketing the empty retail space or to "negotiate an equitable agreement" if plaintiff was unable to find a tenant within "a reasonable time."  Doc. No. 36-1 at ¶¶ 5-6.  He also disputes that Mr. Corwin mentioned the cessation of rent payments for the A.C. Moore space or proposed to link any of defendant's non-payments with any offer for an agreement.  Id. at ¶ 6.  Moreover, according to Mr. Matthews, Mr. Corwin's assertion that plaintiff accepted South Broadway's rent reduction in December 2020 and during the two years thereafter "without complaint or notice of default" is false.  See id. at ¶¶ 7-8.  Mr. Matthews contends, and the record demonstrates, that Delta MB provided South Broadway with a written Notice of Default on April 13, 2021.  Id. at ¶ 8; Doc. No. 36-3.  The Notice of Default provided in substantive part as follows:

> This is a Notice of Default sent pursuant to Article 13 of your Lease.[3]  Attached is a Schedule of Aged Delinquencies showing a breakdown of the rent and other charges due from you through April 13, 2021.  They total $226,250.68.

---

[3] Article 13 of the Lease addresses defaults by the tenant and remedies available to the landlord. Doc. No. 29-3 at pgs. 17-19.

In order to cure your default in payments under the Lease, you must pay $226,250.68 within fifteen (15) (7) [sic] days after receipt of this Notice of Default. Should you fail to do so, Landlord shall be entitled to enforce its rights, including rights of lease termination and eviction, damages and liability for other costs and expenses as set forth in Article 13 of the Lease.

Doc. No. 36-3 at pg. 1(footnote added).

### *Short-Term Sub-Lease with Spirit Halloween*

In July 2021, South Broadway entered into a Temporary Sub-Lease Agreement with Spirit Halloween Superstores LLC ("Spirit Halloween"). Doc. No. 33-4. Thereunder, Spirit Halloween agreed to pay defendant $35,000.00 to sub-lease the former A.C. Moore space from July 16, 2021 to November 15, 2021. Id. at ¶¶ 2-3; Doc. No. 33-1 at ¶ 35. According to Mr. Corwin, South Broadway "voluntarily and in good faith paid all of that amount, $35,000, to Delta MB as part of the deferred May and June 2020 rent." Doc. No. 33-1 at ¶ 36. According to Mr. Matthews, however, the $35,000.00 payment "was not 'voluntary,' but rather required under the Master Lease." Doc. No. 36-1 at ¶ 15. In any event, it is undisputed that Delta MB applied the payment to South Broadway's outstanding balance for overdue rent on the former A.C. Moore portion of the Property rather than to the amounts South Broadway owed to plaintiff under the COVID Rent Relief Agreement. Id.

### *The Parties' Continuing Communications*

In or about early September 2021, Mr. Corwin and Mr. Matthews had a telephone conversation regarding the Property and status of the Lease agreement. See Doc. No. 33-1 at ¶ 37; Doc. No. 36-1 at ¶ 17. Although the parties disagree about the precise details of the conversation, it is undisputed that they discussed whether South Broadway would agree to assign all of its rights in the Property to Delta MB in exchange for forgiveness of some or all amounts due on the A.C.

Moore space.  See Doc. No. 33-1 at ¶ 37; Doc. No. 36-1 at ¶ 17.  It is also undisputed that the

parties failed to reach any such agreement.  Doc. No. 33-1 at ¶ 40; Doc. No. 36-1 at ¶ 18.

Mr. Corwin followed up the telephone conversation in a letter to Mr. Matthews dated

September 3, 2021.  Doc. No. 33-1 at ¶ 40; Doc. No. 33-6.  In his letter, Mr. Corwin stated that he

was "disheartened that we could not reach an agreement on the telephone last Tuesday."  Doc. No.

33-6 at pg. 1.  He also made the following proposal with respect to the Lease:

> My proposal is in exchange for terminating the portion of the Lease equal to
> approximately 24,192 sq. ft., related to the former A.C. Moore store, effective
> immediately, and without liability for any past amounts due from [South Broadway]
> to [Delta MB.]
>
> [South Broadway] will agree to terminate the portion of the Lease equal to 25918
> sq. ft. related to the BBB Store as of February 28, 2023 which is 36 months prior
> to its expiration of its term.  In the interim, [South Broadway] will pay [Delta MB]
> .51722% of the Base Rent, CAM and Real Estate Taxes due under the Lease.
>
> As a result of this proposal, [Delta MB] will be free to rent the former A.C. Moore
> space immediately and presumably for more than the $7.50 per sq. ft. per the Lease.
> And as the remaining portion of the Lease will terminate 3 years prior to its present
> expiration the cash flow of approximately $10,100 per month, or $363,000 will be
> payment for the early termination and forgiveness of liabilities related to the former
> A.C. Moore store.

Id.  Mr. Matthews did not accept Mr. Corwin's proposal.  Neither Mr. Matthews nor anyone else

from Delta MB responded to Mr. Corwin's letter until February 2023 when, as further detailed

below, Mr. Matthews sent Mr. Corwin a proposal that "generally" followed the terms of the

September 3, 2021 letter but contained additional terms.  See Doc. No. 33-1 at ¶¶ 51-54; Doc. No.

36-1 at ¶¶ 18, 22-24.

Delta MB continued to seek a new tenant for the A.C. Moore space throughout 2022, and

kept South Broadway apprised of it efforts.  See Doc. No. 33-1 at ¶¶ 41-42; Doc. No. 36-1 at ¶ 19.

In January of that year, Mr. Matthews informed Mr. Corwin that he was "getting much closer to a

good deal for the former AC Moore space[,]" and in November 2022, Mr. Matthews sent an email

to Mr. Corwin in which he reported being "close to a deal with Burlington Coat for the A.C. Moore space." Doc. Nos. 33-7 and 33-8. However, the record contains no evidence showing that plaintiff entered into an agreement with Burlington Coat or was able to identify any other potential tenants during the time period at issue.

In October 2022, Delta MB also notified South Broadway that it still owed plaintiff for two months of deferred rent under the COVID Rent Relief Agreement. Doc. No. 33-1 at ¶ 44; Doc. No. 33-9 at pg. 2. Specifically, on October 3, 2022, Mr. Matthews sent an email to Mr. Corwin thanking him for sending a partial real estate tax payment for the BBB space and informing him that Delta MB had not received the deferred rental payments for May and June 2020. Doc. No. 33-9 at pg. 2. In a response dated October 14, 2022, Mr. Corwin disputed plaintiff's assertion that no such payments were made. See id. at pg. 1. Specifically, Mr. Corwin referred to South Broadway's $35,000.00 payment to Delta MB in July 2021, and described it as "100% of the money [South Broadway] received from Spirit Halloween[.]" Id. He also proposed that "the Spirit Halloween payment be credited towards the May 2020 deferred rent[.]" Id. Mr. Matthews replied to Mr. Corwin in an email dated November 30, 2022. See Doc. No. 33-8. Therein, Mr. Matthews stated in relevant part as follows: "Concerning the covid deferred rent and the Spirit Halloween rent, the Landlord doesn't see it your way. Landlord is requesting payment of the two months deferred rent per the Covid deferral agreement. Please send payment at your earliest convenience." Id. It is undisputed that at the time these communications occurred, South Broadway had been paying rent, CAM charges, and real estate taxes for the BBB space, but not for the former A.C. Moore space, since December 2020. Doc. No. 33-1 at ¶ 44.

9

### *Parties' Efforts to Negotiate a Termination of the Lease*

On February 7, 2023, Mr. Matthews sent Mr. Corwin a draft Lease Termination and Assignment and Assumption Agreement ("Delta MB Termination Agreement"). Doc. No. 33-1 at ¶ 51; Doc. No. 36-1 at ¶ 22. In an accompanying email, Mr. Matthews stated in relevant part that "[t]he Landlord has prepared the attached draft Lease Assignment for the former AC Moore and [BBB] spaces in Salem, NH[,]" and that "[t]he document generally follows the terms in your letter of September 2, 2021 concerning this matter."[4] Doc. No. 33-10 at pg. 1. Thus, similar to the proposal set forth in Mr. Corwin's September 2021 letter, plaintiff's proposed Delta MB Termination Agreement provided that South Broadway would surrender and transfer to Delta MB all of South Broadway's right, title and interest under the Lease, and would also transfer and assign to Delta MB all of "South Broadway's right, title and interest in, to and under the BBB Sublease," effective on March 1, 2023. Id. at pg. 2. On the other hand, the Delta MB Termination Agreement contained language and terms that exceeded the scope of Mr. Corwin's letter. See id. at pgs. 2-3. For example, but without limitation, the Delta MB Termination Agreement specified that "following subtenant A.C. Moore's abandonment of the subleased premises under the A.C. Moore Sublease, 271 South Broadway defaulted on certain payments due to Delta under the Master Lease (the "**Overdue Amounts**")." Id. at pg. 2 (bold type in original). It also contained the following provisions regarding the parties' obligations:

> 4.    With respect to the BBB Assignment, 271 South Broadway agrees to promptly provide the Bed Bath & Beyond subtenant (the "**BBB Subtenant**") with written notification of the change in the sub-landlord's identity and contact information (Delta agreeing to provide the relevant information to 271 South Broadway), and hereby represents and warrants to Delta that, as of the Effective

---

[4] It is undisputed that Mr. Matthews was referring to Mr. Corwin's September 3, 2021 letter in his February 7, 2023 email to Mr. Corwin. See Doc. No. 33-1 at ¶ 53 n.4.

Date,[5] there are: (a) no outstanding amounts payable to the BBB Subtenant under the BBB Sublease; (b) no outstanding amounts payable from the BBB Subtenant under the BBB Sublease; (c) no defaults, or events that with the passage of time could give rise to a default, with respect to any of the obligations to be performed by 271 South Broadway under the BBB Sublease; and (d) no defaults, or events that with the passage of time could give rise to a default, with respect to any of the obligations to be performed by the BBB Subtenant under the BBB Sublease.

5.     271 South Broadway shall indemnify and defend Delta against, and hold Delta harmless from, any and all claims, liabilities and costs arising out of or relating to: (a) 271 South Broadway's failure to perform any duty or obligation under the A.C. Moore Sublease, and (b) 271 South Broadway's failure to perform any duty or obligation of 271 South Broadway under the BBB Sublease first arising with respect to the period before the Effective Date.

6.     Delta shall indemnify and defend 271 South Broadway against, and hold 271 South Broadway harmless from, any and all claims, liabilities and costs arising out of or relating to Delta's failure to perform any duty or obligation of Delta under the BBB Sublease first arising with respect to the period after the Effective Date.

7.     In further consideration for Delta's willingness to forgive the Overdue Amounts, 271 South Broadway has paid, simultaneously with the execution of this Agreement, the two months rent due with respect to the Master Lease Premises that were deferred during the COVID pandemic, totaling $62,637.50.

Id. at pg. 3 (footnote added).

South Broadway did not agree to the Delta MB Termination Agreement.  See Doc. No. 33-11.  Instead, on February 14, 2023, Mr. Corwin informed Mr. Matthews that he had edits to the document.  Id.  He also informed Mr. Matthews that South Broadway intended to assign the sublease for the BBB portion of the Property to Delta MB as of March 1, 2023.  Id.  Two days later, on February 16, 2023, South Broadway informed BBB that defendant "has, as of March 1, 2023, assigned all of its rights and obligations under the Sublease" between South Broadway and BBB to Delta MB, and directed BBB to deliver all rent checks to Delta MB.  Doc. No. 33-13.  It

---

[5] The "Effective Date" of the Delta MB Termination Agreement is March 1, 2023.  Doc. No. 33-10 at pg. 2.

is undisputed that BBB began sending its rent checks directly to Delta MB beginning in March 2023, and that Delta MB accepted and cashed those checks.  See Doc. No. 33-1 at ¶ 63.  Delta MB claims that it accepted the assignment of South Broadway's right to payments from BBB as partial satisfaction for the debt that defendant owed to plaintiff.  Doc. No. 29-2 at ¶ 23.

On February 16, 2023, Cindy Villareal Tan, acting on behalf of Mr. Corwin, sent a number of documents to Mr. Matthews via email and First Class Mail.  Doc. No. 33-14 at pg. 1.  The documents consisted of: (1) an amended Lease Termination and Assignment and Assumption Agreement (the "South Broadway Termination Agreement") that was executed by South Broadway and contained a signature line for Delta MB, (2) an executed Notice of Assignment and Assumption of Sublease regarding the assignment of the BBB sublease to Delta MB, (3) a spreadsheet detailing South Broadway's payment history, and (4) backup documents showing all payments South Broadway made with respect to the Property from January 2020 through February 2023.  See Doc. No. 33-14 at pgs. 1-3; Doc. Nos. 33-15 through 33-18.  South Broadway's own evidence of its payment history confirms that it stopped making payments for the former A.C. Moore space in December 2020, and that it stopped making any payments for any portion of the Property after February 2023.  See Doc. No. 33-1 at ¶ 62.  Nevertheless, South Broadway contends that the value of the BBB sublease that it assigned to Delta MB in 2023 "exceeds any amounts that might have been owed" to plaintiff.  Id. at ¶ 64.

The South Broadway Termination Agreement differed in substance from the Delta MB Termination Agreement that Mr. Matthews sent to Mr. Corwin on February 7, 2023.  Most notably, the South Broadway Termination Agreement eliminated paragraphs 4, 5, 6 and 7 contained in the Delta MB Termination Agreement.  Compare Doc. No. 33-10 at pg. 3, with Doc. No. 33-14 at pgs. 2-3.  It also eliminated any reference to the deferred payments under the COVID Rental Relief

Agreement.  See Doc. No. 33-14 at pgs. 2-3.  Instead, defendant's proposed Agreement provided in relevant part as follows:

> 1.    271 South Broadway hereby surrenders and transfers to Delta all of 271 South Broadway's right, title and interest under the Master Lease in and to the 50,110 square foot Master Lease Premises, effective as of the Effective Date.
>
> 2.    271 South Broadway hereby transfers and assigns to Delta all of 271 South Broadway's right, title and interest in, to and under the BBB Sublease, effective as of the Effective Date.
>
> 3.    With respect to the BBB Assignment, Delta hereby accepts the foregoing assignment and assumes all the duties and obligations of 271 South Broadway under the BBB sublease to be observed or performed from and after the Effective Date . . .
>
> 4.    As of the Effective Date, the Master Lease is terminated and of no further force or effect, and, subject to compliance with the provisions of this Agreement, neither party shall have any further rights or obligations to the other except for the rights and obligations set forth in this Agreement.

Id.

After receiving the South Broadway Termination Agreement and the other documents from defendant, Mr. Matthews sent an email to Mr. Corwin, dated February 21, 2023, requesting a conference call to discuss the matter further.  Doc. No. 36-1 at ¶ 26; Doc. No. 36-4 at pg. 2.  Mr. Corwin declined to participate in a call.  Doc. No. 36-4 at pgs. 1-2.  Instead, he informed Mr. Matthews as follows:

> I believe you have all the documentation necessary for the transfer of the leasehold interest and the Bed Bath lease.  Please know that the Tenant, 271 South Broadway LLC, was a single purpose LLC[,] which was dissolved on the 14th of this month.
>
> Again, thank you for your consideration and wishing you continued prosperity.

Id. at pg. 2.

On February 28, 2023, Delta MB's counsel sent a letter to Mr. Corwin in which he stated that Delta MB was willing to accept South Broadway's assignment of the BBB sublease but was

not willing to terminate the Lease on the terms proposed in the South Broadway Termination

Agreement.  Doc. No. 36-5 at pg. 1.  He also described the basis for plaintiff's decision as follows:

> Your Proposal does not include the payment of the $62,637.50 owed by 271 South
> Broadway to Delta MB as deferred rent that you agreed to pay (see the attached
> agreement).  Nor does your Proposal include indemnification language or necessary
> representations with respect to amounts due and owing under the BBB Sublease, if
> any, and the lack of defaults under the BBB Sublease.  Without those terms, Delta
> MB is unwilling to release 271 South Broadway from its obligations under its Lease
> and forego receipt of the more than $692,000 that Delta MB is owed for back rent,
> tax reimbursement, and common area maintenance (see the attached summary of
> overdue accounts as of 2/22/23, which amounts are continuing to accrue).

Id.  Furthermore, plaintiff's counsel encouraged Mr. Corwin to accept the Delta MB Termination

Agreement and warned him that Delta MB would prepare for litigation against South Broadway if

Mr. Corwin failed to respond promptly to the letter and accept Delta MB's proposed terms.  Id. at

pgs. 1-2.  Plaintiff claims that Mr. Corwin did not respond to the letter, and there is no evidence to

indicate otherwise.  Doc. No. 1-1 at ¶ 26.

Delta MB admits that it received $103,672.00 in rental payments from BBB.  Id. at ¶ 28.

However, BBB filed for bankruptcy in April 2023 and later vacated the Property.  Doc. No. 33-1

at ¶ 68.  Consequently, Delta MB received no rent from BBB after July 2023.  See id.; Doc. No.

1-1 at ¶ 28.

### The Instant Litigation

On October 5, 2023, Delta MB filed the instant action in Rockingham Superior Court

against South Broadway, the Jack B. Corwin Revocable Trust ("Trust"), Jack B. Corwin in his

personal capacity, and Huntington Holdings, Inc. ("Huntington Holdings").  Doc. No. 1-1.  On

May 21, 2024, defendants removed the matter to this court on the basis of diversity jurisdiction,

and on August 15, 2024, the court dismissed the Trust, Mr. Corwin, and Huntington Holdings

without prejudice for lack of personal jurisdiction.  Doc. Nos. 1 & 26.  Delta MB's remaining

claims consist of claims against South Broadway for material breach of contract (Count I) and unjust enrichment/quantum meruit (Count II). Doc. No. 1-1 at Counts 1 and II. Although Delta MB maintains that it suffered damages after February 2023, when South Broadway stopped making payments under the Lease, it seeks damages only for the amounts defendant owed under the Lease as of February 2023. Doc. No. 29-2 at ¶¶ 24-25. According to Delta MB, those damages consist of $502,186.33 in back rent, $80,937.95 in unpaid CAM expenses, and $159,872.15 in real estate taxes, for a total of $742,996.43. Id. at ¶ 24; Doc. No. 29-7. South Broadway denies that it breached the Lease or that it owes any payments to Delta MB. Doc. No. 33 at pg. 2. Rather, it argues that the parties terminated the Lease "by mutual consent, and [Delta MB] received accord and satisfaction for its claim when [Delta MB] accepted the assignment of South Broadway's rights to payments from its subtenant, [BBB], endorsed and cashed the checks in full and final settlement of all amounts allegedly owed by 271 South Broadway to Delta MB." Id.

## LEGAL STANDARD

Each of the parties moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party[.]'" Taite v. Bridgewater State Univ. Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)). "[A] fact is 'material' if it 'has the potential of affecting the outcome of the case[.]'" Id. (quoting Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)).

"Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must 'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (quoting Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)). The court must view "the record and all reasonable inferences therefrom in the light most favorable to the non-moving part[y]." Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010). "This standard is favorable to the nonmoving party, but it does not give him a free pass to trial." Nieves-Romero v. United States, 715 F.3d 375, 378 (1st Cir. 2013) (quoting Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011)). "'[C]onclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative' will not suffice to ward off a properly supported summary judgment motion." Id. (alteration in original) (quoting Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001)).

"Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." Estate of Hevia, 602 F.3d at 40. Accord TRT Dev. Co., Inc. v. ACE Am. Ins. Co., 566 F. Supp. 3d 118, 123 (D.N.H. 2021) ("On cross-motions for summary judgment, the standard of review is applied to each motion separately."). Accordingly, "[c]ross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001)).

**DISCUSSION**

**I.    Count I: Claim for Material Breach of Contract**

In Count I of its complaint, Delta MB seeks to hold South Broadway liable for material breach of contract.  Doc. No. 1-1 at Count I.  Plaintiff argues that it is entitled to summary judgment on this claim because there is no genuine dispute that the Lease was a binding contract and that South Broadway breached its obligations thereunder by failing to pay $742,996.43 in rent, CAM expenses, and real estate taxes through February 2023.  See Doc. No. 29-1 at pgs. 6-7.  However, South Broadway contends that plaintiff's motion must be denied with respect to Count I because the material facts relating to whether defendant breached the Lease are in dispute.  Specifically, South Broadway argues that the evidence, when viewed in its favor, demonstrates that the parties entered into "a two-part agreement."  Doc. No. 33 at pg. 14.  According to defendant, Delta MB first agreed, in 2021, to re-lease the A.C. Moore space, retain all of the profits from any new tenant, and discharge all amounts due from South Broadway unless Delta MB could not find a new tenant within a reasonable amount of time at which point the parties would "negotiate an equitable agreement."  See id. at pgs. 6, 14.   In the second part of the agreement, which the parties allegedly consummated in 2023, Delta MB agreed to terminate the Lease and forgive all amounts due thereunder in exchange for defendant's surrender of the Property and assignment of the BBB sublease to Delta MB pursuant to the South Broadway Termination Agreement.  See Doc. No. 33 at 7, 14-15.  In other words, South Broadway maintains that a factfinder viewing the record in a manner most flattering to the defendant could conclude that defendant did not breach the Lease because the parties agreed to excuse its failure to pay the full amount it owed to Delta MB.  South Broadway further contends that in any event, Delta MB's willingness to accept the assignment of the BBB sublease, and its receipt of rental payments directly from BBB, constituted an accord and

satisfaction that discharged South Broadway's debt and entitles it to judgment as a matter of law with respect to the breach of contract claim.  Id. at 17-25.  Accordingly, South Broadway argues that the court should deny Delta MB's motion for summary judgment and grant its cross-motion for summary judgment on Count I.  See id. at 25.  For the reasons that follow, plaintiff's motion is granted and defendant's motion is denied with respect to this claim.

A.    South Broadway's Breach of the Lease Agreement

"A successful breach of contract claim under New Hampshire law requires the plaintiff to show (1) that it had a valid, binding contract with the defendant and (2) that the defendant breached the terms of the contract."  Doe v. Trs. of Dartmouth Coll., 731 F. Supp. 3d 222, 241 (D.N.H. 2024).[6]  "A breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract."  Id. (quoting Lassond v. Stanton, 157 N.H. 582 588 (2008).  In the instant case, there is no dispute that the Lease was a binding contract under which South Broadway was obligated to pay monthly rent, CAM expenses, and real estate taxes on a portion of the Property that included the A.C. Moore space and the BBB space.  See Doc. No. 29-2 at ¶¶ 11-12; Doc. No. 33-1 at ¶¶ 15-16.  There also is no dispute that during the time period from December 2020 through February 2023, South Broadway failed to pay the amounts due under the Lease for the A.C. Moore portion of the Property.  See Doc. No. 29-2 at ¶¶ 16-17, 24; Doc. No.

---

[6] Because this is a diversity action, state law applies to Delta MB's claims for breach of contract and unjust enrichment/quantum meruit.  See Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am., LLC, 794 F.3d 200, 204 (1st Cir. 2015) ("Federal courts sitting in diversity apply the substantive law of the state").  Although the parties do not specifically address the question as to which state's law should apply to Delta MB's claims, the Lease contains a choice of law clause, which provides that "[t]he validity, performance and enforcement of this Lease shall be governed by the laws of the State of New Hampshire."  Doc. No. 29-3 at Art. 20, Section 1.  Additionally, both parties rely on New Hampshire law to support their arguments.  See, e.g., Doc. No. 29-1 at pgs. 6-7 (relying on New Hampshire law); Doc. No. 33 at pgs. 16-20 (same).  Accordingly, the court assumes that New Hampshire law governs this case.

29-7; Doc. No. 33-1 at ¶ 62.  At issue is whether South Broadway's failure to pay the amounts due with respect to the former A.C. Moore space constitutes a breach of the Lease or whether, as South Broadway argues, the parties entered into a two-part agreement that relieved South Broadway of its payment obligations under the Lease.

To demonstrate the existence of such an agreement, South Broadway must present evidence of an offer, acceptance, consideration, and "a meeting of the minds on all essential terms[.]"  See Behrens v. S.P. Constr. Co., Inc., 153 N.H. 498, 501 (2006) (describing elements necessary to form a valid, enforceable contract).  "A meeting of the minds is present when the parties assent to the same terms."  Id.  "The parties must have the same understanding of the terms of the contract and must manifest an intention . . . to be bound by the contract."  Trs. of Dartmouth Coll., 731 F. Supp. 3d at 250 (punctuation in original) (quoting Fleet Bank-NH v. Christy's Table, Inc., 141 N.H. 285, 287-88 (1996)).  "Whether the parties had a shared understanding of the contractual terms 'is determined by an objective standard, and not by actual mental assent' to the same contractual terms."  Id. at 250-51 (quoting Int'l Bus. Machs. Corp. v. Khoury, 170 N.H. 492, 501 (2017)).  The "objective standard places a reasonable person in the position of the parties, and interprets a disputed term according to what a reasonable person would expect it to mean under the circumstances."  Behrens, 153 N.H. at 502.

### i.     *Whether the parties entered into an agreement in 2021*

South Broadway argues that the first part of the parties' two-part agreement, whereby Delta MB allegedly agreed in 2021 to re-lease the A.C. Moore space, collect all rent from any new tenant, and discharge any amounts due from South Broadway unless Delta MB was unable to find a new tenant within a reasonable amount of time, is evidenced by "(i) the January 28, 2022 email from John Matthews stating he was close to re-leasing the space and (ii) the November 30, 2022 email

from John Matthews saying he was close to re-leasing the A.C. Moore space to Burlington Coat

Factory." Doc. No. 33 at pg. 14 (citations omitted). This court finds that the referenced emails are

insufficient to establish the existence of an enforceable agreement. In the January 28, 2022 email,

which Mr. Matthews sent to Mr. Corwin, Mr. Matthews stated in substantive part as follows:

> I'm getting much closer to a good deal for the former AC Moore space. Let's plan
> to have a call next Wednesday or Thursday? Hope it's warm and sunny in Cal, we
> have a major blizzard coming through here tomorrow.

Doc. No. 33-7. In the November 30, 2022 email, which Mr. Matthews also sent to Mr. Corwin,

Mr. Matthews wrote the following:

> Hope you had an enjoyable Thanksgiving. To update you, I'm close to a deal with
> Burlington Coat for the A.C. Moore space. This will be a good addition to the
> shopping center. Concerning the covid deferred rent and the Spirit Halloween rent,
> the Landlord doesn't see it your way. Landlord is requesting payment of the two
> months deferred rent per the Covid deferral agreement. Please send payment at
> your earliest convenience.

Doc. No. 33-8. Mr. Matthews provided no other substantive information in his communications.

See id.; Doc. No. 33-7.

No reasonable jury could conclude from this evidence that the parties entered into a valid

agreement in 2021, much less that Delta MB agreed to accept sole responsibility to find a tenant

to occupy the A.C. Moore space or excuse South Broadway's failure to comply with the terms of

the Lease. As an initial matter, nothing in the emails manifests the parties' intent to be bound by a

contractual arrangement. Nor do the emails purport to define any specific contractual terms.

Moreover, nothing in the emails indicates that the parties reached "a meeting of the minds on all

essential terms" of an agreement in 2021 or at any other time. See Behrens, 153 N.H. at 501.

Although Mr. Matthews' statements suggest that Delta MB took responsibility for finding a new

tenant for the abandoned retail space, they shed no light on the nature or scope of that responsibility

or how it impacted South Broadway's obligations under the terms of the Lease. Even viewing this

evidence in the light most favorable to South Broadway, therefore, no reasonable factfinder could conclude that the parties reached a meeting of the minds on the terms of an enforceable contract.

To the extent South Broadway relies on Mr. Corwin's account of his oral communications with Mr. Matthews in December 2020, that evidence is insufficient to raise a genuine issue of material fact regarding the existence of a contractual agreement between the parties that altered defendant's Lease obligations.  Even if the court accepts Mr. Corwin's assertions that Mr. Matthews agreed Delta MB would take responsibility for marketing the abandoned A.C. Moore space, the parties would "negotiate an equitable agreement" if plaintiff was unable to find a tenant within a "reasonable amount of time," and "271 South Broadway would only be financially responsible going forward for the space occupied by [BBB]," Doc. No. 33-1 at ¶¶ 27-29, South Broadway cannot show that Mr. Matthews' statements relieved defendant of its payment obligations to Delta MB.  It is undisputed that the Lease required South Broadway to pay monthly rent, CAM expenses, and real estate taxes associated with the leased portion of the Property, including the A.C. Moore portion of the Property.  Doc. No. 29-2 at ¶ 11; Doc. No. 29-3 at Art. 2, Section 1, Art. 8, Art. 24; Doc. No. 33-1 at ¶ 15.  Under Article 22 of the Lease, "[n]o change, amendment or addition to [the] Lease shall be effective unless in writing and signed by the parties." Id. at Art. 22, Section 2.  South Broadway points to no writing signed by both parties in 2020, 2021, or at any time thereafter that purports to amend the Lease or excuse any of its responsibilities thereunder.  Pursuant to the parties' existing contract, therefore, South Broadway remained responsible for paying the rent, CAM expenses, and real estate taxes associated with the A.C. Moore space despite any statements Mr. Matthews made during his communications with Mr. Corwin.

South Broadway's assertion that Delta MB agreed to excuse defendant's failure to comply with its payment obligations for the A.C. Moore space "unless Delta MB could not find a tenant in a reasonable amount of time[,]" Doc. No. 33 at pg. 7, is also at odds with the express terms of the Lease.  Under Article 7:

> [t]he Tenant shall always, and notwithstanding  any such assignment, mortgage or subletting or subleasing and/or granting concession, and notwithstanding the acceptance of rent by the Landlord from any such assignee, mortgagee or subtenant, remain liable for the payment of rent hereunder and for the performance of the agreements, conditions, covenants and terms herein contained, on the part of the Tenant herein to be kept, observed or performed.

Doc. No. 29-3 at Art. 7, Section 5.  Therefore, South Broadway remained responsible for all payments due under the Lease, regardless of its subtenant's decision to abandon the Property and plaintiff's efforts to locate a new tenant.  Furthermore, any suggestion that Delta MB waived its right to pursue delinquent payments for the former A.C. Moore space due to its actions in marketing the space and accepting defendant's reduced payments is inconsistent with Article 22, Section 1, which provides: "No waiver by Landlord or Tenant of any condition or covenant of Landlord or Tenant hereunder shall be deemed to imply or constitute a further waiver by Landlord or Tenant of the same or any other condition or covenant."  Doc. No. 29-3 at Art. 22, Section 1.  It is also inconsistent with Article 32 of the Lease, which provides:

> The failure of Landlord or Tenant to seek redress for violation, or to insist upon the strict performance of any covenant or condition of this Lease, shall not prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation.  The receipt by Landlord of rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach.  No provision of this Lease shall be deemed to have been waived by Landlord or Tenant unless such waiver be in writing signed by Landlord or Tenant, as the case may be.

Doc. No. 29-3 at Art. 32.  The record contains no writing, signed by Delta MB, in which plaintiff agreed to waive defendant's failure to comply with its payments obligations.  Rather, in April 2021,

Delta MB informed South Broadway, in writing, that it was <u>not</u> waiving its right to payments for the former A.C. Moore space.  <u>See</u> Doc. No. 36-3.

The undisputed record further supports the conclusion that in 2021, Delta MB "gave no assent to, and did not consummate" an agreement to relieve South Broadway from liability for payments under the Lease.  <u>See</u> Doc. No. 36 at pg. 19.  For example, but without limitation, it is undisputed that Delta MB provided South Broadway with a Notice of Default on April 13, 2021. Doc. No. 36-3.  Therein, plaintiff informed South Broadway that it was in default for failing to pay $226,250.68 in rent and other charges for the A.C. Moore space through the date of the Notice.  <u>Id.</u> As of April 2021, therefore, there was no meeting of the minds between the parties with respect to the terms of an agreement.  Additionally, but again without limitation, it is undisputed that in a letter to Mr. Matthews dated September 3, 2021, Mr. Corwin proposed an agreement under which Delta MB would agree to immediately terminate the portion of the Lease pertaining to the A.C. Moore space and forgive any "liability for any past amounts due from [South Broadway] to [Delta MB,]" in exchange for South Broadway's agreement to terminate the portion of the Lease pertaining to the BBB space three years prior to the expiration of the lease term and, in the interim, pay Delta MB ".51722% of the Base Rent, CAM and Real Estate Taxes due under the Lease." Doc. No. 33-6.  There is no evidence that Delta MB responded to Mr. Corwin's proposal until February 2023, when Mr. Matthews sent Mr. Corwin the Delta MB Termination Agreement for defendant's consideration.  <u>See</u> Doc. No. 33-1 at ¶¶ 51-52; Doc. No. 36-1 at ¶¶ 18, 22. Accordingly, the undisputed facts establish that there was no meeting of the minds, at any point during 2021, on an agreement to excuse South Broadway's payment obligations under the terms of the parties' Lease.

Indeed, in early 2023, both parties acknowledged that South Broadway remained liable for rent, CAM expenses, and real estate taxes relating to the former A.C. Moore space.  See Doc. No. 33-10 at pg. 2; Doc. No. 33-14 at pg. 2.  Thus, the record demonstrates that on February 7, 2023, Mr. Matthews sent Mr. Corwin the Delta MB Termination Agreement, which provided, inter alia, that "South Broadway defaulted on certain payments due to Delta under the Master Lease (the 'Overdue Amounts')" and proposed specific terms under which Delta MB would be willing "to forgive the Overdue Amounts[.]"  Doc. No. 33-10 at pgs. 2-3 (boldface type omitted).  It further demonstrates that in the South Broadway Termination Agreement, which defendant sent to Delta MB on February 16, 2023, South Broadway acknowledged that "following subtenant A.C. Moore's abandonment of the subleased premises under the A.C. Moore Sublease, 271 South Broadway elected not to pay currently certain payments . . . due to Delta under the Master Lease (the 'Overdue Amounts')."  Doc. No. 33-14 at pg. 2 (boldface type omitted).  South Broadway also proposed to surrender the Property to Delta MB, terminate the Lease, and assign all of its rights and obligations under the BBB sublease to Delta MB, among other things, "to compensate Delta for the Overdue Amounts[.]"  Id.  For this reason as well, no reasonable jury could conclude that the parties consummated an enforceable agreement in 2021 that relieved South Broadway of its outstanding payment obligations to Delta MB.

ii.    *Whether the parties entered into an agreement in 2023*

Defendant contends that "[t]he second part of the agreement between the parties was 'The Lease Termination and Assignment and Assumption Agreement'" that South Broadway signed and sent to Mr. Matthews on February 16, 2023.   Doc. No. 33 at 14.  South Broadway asserts that Delta MB accepted the South Broadway Termination Agreement, which called for the termination of the Lease as of the Effective Date of March 1, 2023.  See id. at 15; see also Doc. No. 33-14 at

pgs. 2-3.  It also asserts that "beginning March 1, 2023, BBB began remitting their rent checks directly to Delta MB, and Delta MB accepted and cashed those checks pursuant to the [South Broadway Termination Agreement]."  Doc. No. 33 at pg. 15.  As Delta MB argues, however, "[t]he fundamental and dispositive problem with this claim is that the parties did not, as a matter of undisputed fact, execute or otherwise agree on the terms of that agreement."  Doc. No. 36 at pg. 19.  Therefore, South Broadway cannot avoid summary judgment in plaintiff's favor on Count I of the complaint.

There is no evidence showing that Delta MB executed or otherwise agreed to the terms of the South Broadway Termination Agreement.  On the contrary, the undisputed facts demonstrate that Delta MB rejected South Broadway's proposal.  Specifically, in a letter to Mr. Corwin dated February 28, 2023, plaintiff's counsel stated that although Delta MB was willing to accept the assignment of the BBB sublease, it was "not willing to terminate 271 South Broadway's Master Lease on the terms [South Broadway] propose[d]."  Doc. No. 36-5 at pg. 1.  He also stated that in the absence of South Broadway's agreement to pay the $62,637.50 it owed to Delta MB in deferred rent, and to indemnify plaintiff or make certain representations with respect to the BBB sublease, Delta MB was "unwilling to release 271 South Broadway from its obligations under its Lease and forego receipt of the more than $692,000 that Delta MB is owed for back rent, tax reimbursement, and common area maintenance[.]"  Id.  Therefore, the record establishes that there was no meeting of the minds on the terms of the South Broadway Termination Agreement.

The fact that Delta MB accepted the assignment of the BBB sublease and BBB's rental payments thereunder is insufficient to demonstrate the existence of an enforceable agreement to terminate the Lease or excuse South Broadway's breach of the Lease terms.  The record establishes that plaintiff accepted the assignment of South Broadway's right to payments from BBB as partial

satisfaction of defendant's debt.  Doc. No. 29-2 at ¶ 23.   Its conduct in this regard did not constitute a waiver of its rights under the Lease or prevent it from seeking redress for South Broadway's breach of its payment obligations.  See Doc. No. 29-3 at Art. 32 (providing that "[t]he receipt by Landlord of rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach" and that "[n]o provision of this Lease shall be deemed to have been waived by Landlord or Tenant unless such waiver be in writing signed by Landlord or Tenant, as the case may be.").  Moreover, Delta MB rejected South Broadway's proposal for the termination of the Lease.  See Doc. No. 36-5 at pg. 1.  Accordingly, the parties failed to achieve a meeting of the minds on this matter.

In an Affidavit supporting South Broadway's opposition to plaintiff's motion for summary judgment, Mr. Corwin avers that Delta MB accepted the South Broadway Termination Agreement, and that the parties entered into a two-part agreement under which Delta MB agreed to forgive all amounts due under the Lease.  See Doc. No. 33-1 at ¶¶ 63-68.  This testimony is insufficient to defeat plaintiff's breach of contract claim.   "[T]he party opposing summary judgment on the ground that there are disputed facts must present substantial evidence in opposition to a motion for summary judgment."  Estes v. ECMC Grp, Inc., 565 F. Supp. 3d 244, 256 (D.N.H. 2021) (emphasis in original) (quotations and citations omitted).  Consequently, the court will not consider Affidavit testimony to the extent it consists of legal arguments or conclusory assertions.  See Power v. Connectweb Techs., Inc., 740 F. Supp. 3d 63, 71 (D. Mass. 2024) (explaining that affidavit testimony containing conclusory assertions, as opposed to "specific factual information made on the basis of personal knowledge," is insufficient to counter a motion for summary judgment); Estes, 565 F. Supp. 3d at 256-57 (finding that affiant's conclusory statement denying authenticity of certain loan documents was insufficient to create a genuine dispute that would preclude

summary judgment (quotations and citation omitted)).  Mr. Corwin's conclusory statements regarding the existence of an agreement are not entitled to consideration on summary judgment, and South Broadway cannot rely on them to raise a genuine issue of material fact as to whether the parties consummated an enforceable contract resolving South Broadway's responsibility for unpaid amounts due under the Lease.

>B.    South Broadway's Claim of Accord and Satisfaction Under State
>      Common Law and the New Hampshire Uniform Commercial Code

Next, South Broadway argues that plaintiff's motion should be denied, and defendant's cross-motion should be allowed with respect to Count I, because Delta MB received accord and satisfaction for its claim against defendant under both New Hampshire common law and the New Hampshire Uniform Commercial Code ("UCC"), RSA 382-A:3-311.  Doc. No. 33 at pgs. 17-25.  Specifically, South Broadway maintains that by accepting the assignment of the BBB sublease, and cashing BBB's rent checks "on the express and unambiguous condition that the payment would constitute full satisfaction of any further obligation Defendant might have owed to Plaintiff, Plaintiff was bound by that condition" under the doctrine of accord and satisfaction.  Id. at 20.  It also contends that the undisputed facts of this case satisfy the requirements of RSA 382-A:3-311, which governs accord and satisfaction by use of a negotiable instrument.  Id. at pgs. 21-25.  Delta MB argues that accord and satisfaction does not apply to the circumstances presented here because there was no mutual assent or meeting of the minds, RSA 382-A:3-311 is inapplicable to the facts of this case, and plaintiff's acceptance of the rent checks directly from BBB could not relieve South Broadway of its payment obligations under the unambiguous terms of the Lease.  Doc. No. 36 at pgs. 21-22.

i.  *Common law*

"An accord and satisfaction may properly be defined as a method of discharging a contract, or setting aside a cause of action . . . by substituting for such contract or cause of action an agreement for the satisfaction thereof and the execution of such subsequent agreement." Decato Bros., Inc. v. Westinghouse Credit Corp., 129 N.H. 504, 506 (1987) (punctuation in original) (quotations and citation omitted).  "The following are the essential elements of an accord and satisfaction: (1) proper subject matter; (2) competent parties; (3) an assent or meeting of the minds; (4) consideration." Id. (emphasis added).  "In New Hampshire, . . . the burden of proving an accord and satisfaction is on the defendant who asserts accord and satisfaction as a defense against an action for breach of contract."   In re Campano, 293 B.R. 281, 287 n.3 (D.N.H. 2003). Consequently, the burden of proof on this issue rests with South Broadway.

The undisputed facts in this case demonstrate that Delta MB rejected South Broadway's proposal to terminate the Lease and discharge defendant's debt in exchange for the assignment of the BBB sublease to Delta MB.  See Doc. No. 36-5 at pg. 1 (explaining that Delta MB was willing to accept the assignment of the BBB sublease but was unwilling to discharge South Broadway's debt under the Lease based on defendant's agreement to surrender the leased premises and assign the BBB sublease to plaintiff).  Consequently, no reasonable jury could find that there was mutual assent or a meeting of the minds with respect to whether Delta MB's acceptance of rent from BBB resulted in the discharge of South Broadway's remaining debt to plaintiff.    Because South Broadway cannot meet an essential element of its claim of accord and satisfaction under New Hampshire common law, it cannot rely on this defense to defeat plaintiff's breach of contract claim.

### ii.  _The New Hampshire UCC_

To the extent South Broadway relies on the New Hampshire UCC to support its claim of an accord and satisfaction, its argument is similarly insufficient to warrant summary judgment in its favor or withstand summary judgment in favor of Delta MB.  The relevant provision of the UCC, entitled "Accord and Satisfaction by Use of Instrument," provides in pertinent part as follows:

> (a)     If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument, the following subsections apply.

> (b)     Unless subsection (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

RSA 382-A:3-311.  An "instrument" for purposes of RSA 382-A is defined as a "negotiable instrument."  See RSA 382-A:3-103(b) (an "Instrument" for purposes of Article 382-A is defined in Section 3-104); RSA 382-A:3-104(b) ("'Instrument' means a negotiable instrument.").  Accordingly, RSA 382-A:3-311 only applies where "a person against whom a claim is asserted" establishes that "that person . . . tendered [a negotiable] instrument to the claimant as full satisfaction of the claim."  RSA 382-A:3-311(a).

South Broadway argues that BBB's rent checks constituted negotiable instruments for purposes of RSA 382-A:3-311(a). See Doc. No. 33 at pgs. 21-22.  It further argues that the remaining requirements of Section 3-311(a) have been met because "Defendant tendered assignment of the BBB Sublease, and BBB, in turn, tendered the checks to the Plaintiff in good faith and 'as full satisfaction of the claim.'"  Doc. No. 33 at pg. 22 (quoting RSA 382-A:3-311(a)).  However, South Broadway cannot establish that South Broadway – the person against whom Delta

MB's claim is asserted – is the same person who tendered the negotiable instruments to the claimant, as required to satisfy RSA 382-A:3-311(a).  Therefore, it fails to show that the statute applies to this case.

Even if South Broadway made such a showing, it fails to establish that the amount of Delta MB's claim "was unliquidated or subject to a bona fide dispute[,]" as required under RSA 382-A:3-311(a)(ii).  Whether a claim is "liquidated" or "unliquidated" "generally refer[s] to a claim's value (and the size of the corresponding debt) and the ease with which that value can be ascertained."  In re De Jonghe, 334 B.R. 760, 769 (1st Cir. BAP 2005).  "If the claim is subject to ready determination and precision in computation of the amount due, it is generally viewed as liquidated."  Id. (quotations and citations omitted).  However, if the value of the claim "depends instead on 'a future exercise of discretion, not restricted by specific criteria, the claim is unliquidated.'"  Id. (quoting Mazzeo v. United States (In re Mazzeo), 131 F.3d 295, 304 (2d Cir. 1997)).  "[C]ourts have generally held that a debt is liquidated where the claim is determinable by reference to an agreement or by a simple computation."  Id. (quotations, punctuation and citation omitted).

Although South Broadway challenges its liability to Delta MB in the instant case, it does not contest plaintiff's calculation of its damages or otherwise attempt to raise a genuine dispute regarding the amount of plaintiff's claim.  Even if it attempted to do so, the record establishes that the amount of defendant's payment obligations are defined by the terms of the Lease and are readily determinable based on specific criteria.  In short, there is no genuine dispute that Delta MB's claim is liquidated and not subject to a bona fide dispute.  For this reason as well, South Broadway cannot show that there is any basis for a finding of accord and satisfaction under the New Hampshire UCC.

In the absence of any evidence of an agreement for the discharge of South Broadway's debt to Delta MB, the impact of BBB's rent payments is controlled by Article 7 of the Lease, which pertains to assignments, subletting and mortgages by the tenant.  Pursuant to Section 1 of Article 7,  the parties expressly agreed that no assignment by defendant of any of its rights under the Lease, "nor the acceptance of rent by the Landlord from such assignee shall relieve, release or in any manner affect the liability of the Tenant[.]"  Doc. No. 29-3 at Art. 7, Section 1(a).  They similarly agreed, under Article 7, Section 5 of the Lease, that the Tenant shall "remain liable for the payment of rent" and for the performance of its "agreements, conditions, covenants and terms herein contained," notwithstanding any assignment or "acceptance of rent by the Landlord" from any assignee or subtenant.  Id. at Art. 7, Section 5.  Therefore, the assignment of the BBB sublease to Delta MB, and Delta MB's acceptance of rent from BBB, does not relieve South Broadway of its payment obligations under the Lease.  Delta MB is entitled to summary judgment on its breach of contract claim and South Broadway's cross-motion must be denied.

## II.    **Count II: Claim for Unjust Enrichment/Quantum Meruit**

Delta MB argues that in the event the court fails to grant summary judgment in its favor with respect to its breach of contract claim, it is entitled to summary judgment on its claim for unjust enrichment/quantum meruit.  Doc. No. 29-1 at pgs. 7-8.  South Broadway argues that plaintiff's motion for summary judgment should be denied with respect to this claim because "the parties' relationship is governed by a valid, express contract."  Doc. No. 33 at pg. 16.  This court agrees that because a valid, express contract governs the parties' relationship with respect to the Property, Delta MB is not entitled to summary judgment on its alternative claim for unjust enrichment/quantum meruit.

Unjust enrichment and quantum meruit are "quasi-contractual theories[.]" Estes, 565 F. Supp. 3d at 306. "Quantum meruit is a restitutionary remedy intended for use by contracting parties who are in material breach and thus unable to sue on contract." Id. (quoting R.J. Berke & Co., Inc. v. J.P. Griffin, Inc., 116 N.H. 760, 764 (1976)). "Unjust enrichment is an equitable remedy that is available when an individual receives 'a benefit which would be *unconscionable* for him to retain.'" Turner v. Shared Towers VA, LLC, 167 N.H. 196, 202 (2014) (emphasis in original) (quoting Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 669 (2013)). However, recovery is unavailable under either theory when the parties are subject to a valid contract covering the same subject matter of the parties' dispute. See id. ("a 'court cannot allow recovery under a theory of unjust enrichment when there is a valid, express contract covering the subject matter at hand.'" (quoting Axenics, 164 N.H. at 669)); Universal Am-Can, Ltd. v. CSI-Concrete Sys., Inc., No. 11-cv-030-LM, 2012 WL 579167, at *8 (D.N.H. Feb. 22, 2012) ("Because there is an agreement that covers the subject matter of the dispute, [plaintiff] is not entitled to recover under a theory of quantum meruit.").

South Broadway contends that Delta MB cannot prevail on its alternative claim for unjust enrichment/quantum meruit because defendant's payment obligations to plaintiff are covered by the South Broadway Termination Agreement. Doc. No. 33 at pg. 17. For the reasons detailed above, that Agreement does not constitute a valid contract. Nevertheless, the parties' relationship remains subject to the Lease, which is a valid contract covering the subject matter of this litigation. Therefore, Delta MB is not entitled to summary judgment on its alternative claim under Count II of the complaint.

**CONCLUSION**

For all the reasons detailed herein, Plaintiff's Motion for Summary Judgment (Doc. No. 29) is granted and Defendant's Cross-Motion for Summary Judgment (Doc. No. 32) is denied.

The clerk shall enter judgment and close the case.

SO ORDERED.

_____
Talesha L. Saint-Marc
United States Magistrate Judge

July 28, 2025

cc:    Counsel of record

33